IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

RCV'D – USDC COLA SC
JUN 5 '26 AM8:59

| | |
|---|---|
| Jeffrey A. Williams | ) |
| 8 Misty Morning Drive | ) |
| Columbia SC 29229 | ) |
| Plaintiff, | ) Civil Action No._____ |
| V. | ) |
| Lexington Medical Center | ) |
| 2720 Sunset BLVD, | ) |
| West Columbia, SC 29169 | ) |

## COMPLAINT AND JURY DEMAND

Plaintiff Jeffrey A. Williams ("Plaintiff"), proceeding *pro se*, brings this action against Defendant Lexington County Health Services District, Inc., doing business as Lexington Medical Center ("Defendant"), alleging unlawful employment practices involving interference and retaliation under the Family and Medical Leave Act (FMLA), discrimination and retaliation under Title VII of the Civil Rights Act of 1964, and discrimination and retaliation under Title I of the Americans with Disabilities Act (ADA). In support thereof, Plaintiff respectfully alleges as follows:

### I. JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, as it arises under the Constitution and statutory laws of the United States.
2. The federal questions presented herein arise specifically under:
   - **a.** The Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*;
   - **b.** Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; and
   - **c.** Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*
3. Venue is proper in the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## II. PARTIES

4. Plaintiff Jeffrey A. Williams is a citizen of the United States and a resident of Richland County, South Carolina.

5. Defendant Lexington County Health Services District, Inc. (d/b/a Lexington Medical Center) is a domestic corporation operating and doing business in the State of South Carolina, with its principal place of business located at 2720 Sunset Blvd., West Columbia, SC 29169.

6. Defendant may be formally served via its Registered Agent: Kirk Jenkins, 2720 Sunset Blvd., West Columbia, SC 29169.

## III. FACTUAL ALLEGATIONS

7. Plaintiff commenced his employment with Defendant on or about March 22, 2022, performing services remotely from his home residence as a professional Medical Coder.

8. At all times relevant to his employment, Plaintiff was the only Black male working within his specific department.

9. Plaintiff was originally hired by supervisor Cristina Kelly and remained under her direct management and supervision for approximately the first year of his employment.

10. During this initial year, Plaintiff consistently received satisfactory job performance reviews, maintained a clean disciplinary record with zero write-ups, and did not experience any form of discrimination. Furthermore, Ms. Kelly was fully accommodating of Plaintiff's approved intermittent FMLA leave.

11. Following the resignation of Cristina Kelly, Stormi Middleton assumed supervisory authority over the department. Immediately thereafter, the workplace environment changed, and Plaintiff was subjected to unlawful discrimination and FMLA violations.

12. Ms. Middleton was the primary corporate actor who instigated, directed, and perpetrated these discriminatory actions and statutory violations against Plaintiff.

13. At all times relevant to this action, Plaintiff consistently performed his essential job duties satisfactorily and met Defendant's legitimate business expectations.

14. On or about February 1, 2023, Plaintiff developed a serious health condition requiring ongoing medical treatment, which qualified him for protected leave from work.

15. Plaintiff properly notified Defendant of his serious medical condition, requested leave protected under the FMLA, and subsequently submitted valid medical documentation and certifications supporting his request.

16. On or about March 23, 2023, Plaintiff was placed on approved short-term disability leave.

17. At all times relevant to this action, Plaintiff suffered from a severe cervical spine impairment that causes debilitating pain and numbness in Plaintiff's right arm, which substantially limits major life activities, including working and the functional use of Plaintiff's upper extremities.

18. Medical physicians evaluated Plaintiff's condition via X-rays and determined that Plaintiff requires major spinal surgery, specifically the surgical implantation of rods and screws in the cervical spine. To date, Plaintiff continues to suffer from this condition and has been unable to undergo the required surgical procedure.

19. Despite this severe physical impairment, Plaintiff remained a "qualified individual" under the ADA, as amended, fully capable of performing the essential functions of the Medical Coder position.

20. To manage the condition while working, Plaintiff required minor, reasonable scheduling flexibility to allow prescribed medication to become effective before beginning duties, or alternatively, utilized employer-provided short-term disability leave during periods of severe physical exacerbation.

21. As a direct result of Defendant's discriminatory and retaliatory conduct regarding these medical needs, Plaintiff was forced to work under a constant, pervasive fear of imminent job termination, causing severe emotional distress.

22. Following his request for and use of protected leave, Defendant began a calculated campaign of interference, intimidation, and retaliation against Plaintiff.

23. On January 3, 2024—immediately following the expiration of Plaintiff's FMLA benefit year—the newly appointed department manager, Michelle Jawanda Wooten, issued Plaintiff a formal disciplinary write-up.

24. Ms. Wooten informed Plaintiff via email that the discipline was based on allegations of 122 "tardies," and explicitly stated that Stormi Middleton had mandated and directed her to issue the write-up.

25. Plaintiff immediately responded to Ms. Wooten, explaining that the cited tracking periods occurred during approved intermittent FMLA leave and had been fully authorized by previous management.

26. Plaintiff explicitly advised Ms. Wooten that penalizing Plaintiff for utilizing protected medical leave constituted a direct violation of federal law.

27. Despite Plaintiff's clear objections, Ms. Wooten and Ms. Middleton proceeded with the disciplinary action, delivering an ultimatum that if Plaintiff did not sign the write-up within two days, Plaintiff would be immediately suspended without pay.

28. Prior to this event, on December 28, 2023, Plaintiff had notified Defendant via email that he was severely ill but was continuing to work to assist with end-of-month corporate operations.

29. The following morning, Plaintiff suffered a febrile seizure, causing him to start his work shift late. Despite his immediate communication and prior medical notices, Defendant issued a disciplinary write-up for a "no-call, no-show."

30. The hostile work environment perpetrated by Stormi Middleton culminated in the abrupt and targeted termination of Plaintiff's spouse on or around January 2024.

31. This retaliatory action significantly intensified the severe emotional distress, anxiety, and reasonable fear of job insecurity that Plaintiff was already experiencing as a direct result of Defendant's ongoing discrimination.

32. Following the departure of the supervisor who originally hired Plaintiff and approved his FMLA-protected absences, new management retroactively and systematically altered entries within the company's timekeeping system to reclassify previously excused, FMLA-protected absences and tardiness as unexcused, using them to penalize Plaintiff.

33. Defendant treated Plaintiff differently and harsher than similarly situated employees outside of his protected classes. On or about December 2023, a department manager informed Plaintiff that management had allowed another employee leniency for an unavoidable tardy.

34. While other employees were routinely granted leniency for uncontrollable circumstances, Plaintiff was harshly penalized, including being written up for being "tardy" on an occasion when he was actively escaping an active residential fire.

35. On or about January 9, 2024, Plaintiff sent an internal email communication to Human Resources Representative Bootsie Wynne, explicitly reporting that corporate management was targeting him and expressing an acute, reasonable fear that exercising his statutory FMLA rights would result in immediate termination.

36. As concrete evidence of this ongoing harassment, Plaintiff informed Human Resources that Manager Michelle Jawanda Wooten had issued an intimidating email demanding that Plaintiff justify a two-hour "gap" in his remote working schedule from the previous day.

37. In reality, the two-hour gap in production was a direct consequence of Plaintiff being actively engaged in an official corporate auditing session conducted by Ms. Wooten herself.

38. During that specific auditing session, Plaintiff demonstrated exceptional professional competence as a Medical Coder, achieving an objective accuracy score of 97%.

39. Ms. Wooten's subsequent demands for justification regarding a scheduling gap she actively created and participated in demonstrates that Defendant engaged in hyper-scrutiny, bad-faith tracking, and intentional intimidation to manufacture a pretextual paper trail against Plaintiff.

40. On August 4, 2024, Plaintiff submitted a formal, comprehensive written complaint via email to Human Resources and management, re-identifying the ongoing FMLA violations, time-card alterations, and discriminatory practices.

41. At all times relevant to this action, corporate policy enforced by Lexington Medical Center ("LMC") explicitly dictated that attendance infractions, including "tardies," expire automatically after a rolling twelve-month period and may not legally be utilized to support subsequent disciplinary actions.

42. In direct violation of this corporate policy and federal law, Defendant retroactively counted expired, FMLA-protected absences against Plaintiff's attendance record to manufacture a false history of chronic unreliability.

43. Furthermore, Defendant routinely penalized Plaintiff for tardiness on occasions when automated system logs conclusively demonstrated that Plaintiff had successfully authenticated and logged into the corporate network on time via the DUO dual-factor security system.

5

44. Defendant further demonstrated a severe and discriminatory lack of scheduling flexibility by penalizing Plaintiff for an unavoidable attendance delay caused by an active residential fire, despite the fact that Plaintiff successfully completed his full shift and fulfilled all required operational hours for that day.

45. Specifically, Plaintiff's formal internal complaint on August 4, 2024, demanded that Defendant answer six precise inquiries regarding his ongoing treatment and employment security:

- **Inquiry 1:** Whether an employee who is forced to flee an active residential fire or similar emergency to ensure physical safety will be subjected to disciplinary action or accumulate attendance occurrences.

- **Inquiry 2:** Whether Defendant will formally excuse the manufactured "tardies" applied to Plaintiff's record on days where network security logs prove Plaintiff logged into the DUO system prior to the start of his shift, regardless of minor system delays required to launch the secondary EKG timekeeping platform.

- **Inquiry 3:** Whether Defendant will retract the disciplinary actions based on tardies that had been explicitly authorized and excused by Plaintiff's immediate supervisor, Michelle Wooten, but were subsequently retroactively unexcused at the directive of upper management.

- **Inquiry 4:** Whether Plaintiff would be subjected to further unlawful retaliation or adverse employment actions as a direct consequence of exercising his statutory rights under the Family and Medical Leave Act (FMLA).

- **Inquiry 5:** Whether corporate management would subject Plaintiff to operational or disciplinary retaliation for drafting and submitting the formal internal complaint.

- **Inquiry 6:** Whether Plaintiff would be permitted to exercise the same workplace rights, benefits, and protections afforded to all other similarly situated employees under established LMC policies and procedures.

46. Defendant flatly refused to respond to or investigate Plaintiff's inquiries, thereby confirming Plaintiff's reasonable fear of imminent, retaliatory termination and rendering his working conditions completely untenable.

47. Upon receiving Plaintiff's formal internal grievance, Human Resources Representative Bootsie Wynne immediately abrogated her corporate duty to conduct an independent investigation; instead, she explicitly authorized the primary alleged wrongdoer, Stormi Middleton, to handle and respond to Plaintiff's inquiries.

48. To date, Defendant has failed to provide any formal, good-faith answers to the six specific inquiries submitted by Plaintiff regarding his workplace protections and safety.

49. Rather than addressing Plaintiff's concerns or providing the requested assurances of fairness, Ms. Middleton utilized the opportunity to escalate the hostile work environment. In a subsequent email communication, Ms. Middleton issued further pretextual threats of severe disciplinary action, up to and including immediate job termination, under the guise of policy enforcement.

50. This coordinated response by Human Resources and corporate management served as an act of objective intimidation, achieving the opposite effect of ensuring workplace equity, and further solidifying Plaintiff's reasonable belief that exercising his statutory rights would result in immediate retaliatory termination.

51. On or about March 2024, Misty Dempsey was appointed as Plaintiff's immediate, direct supervisor, operating under the structural authority and command of Department Manager Stormi Middleton.

52. Upon reviewing Plaintiff's files, Ms. Dempsey explicitly communicated to Plaintiff her professional opposition to issuing any disciplinary action regarding the residential fire emergency, noting that a write-up under those extreme circumstances was unwarranted; however, Ms. Middleton overrode her discretion and strictly mandated that the discipline be issued.

53. In an act of ongoing retaliation, the Defendant intentionally misled the Equal Employment Opportunity Commission (EEOC) in its corporate position statement submitted on March 24, 2025. While the Defendant claimed the Plaintiff had unexcused tardiness, these absences occurred during a period of documented disability and had been explicitly approved by management. The Defendant possessed comprehensive documentation of the Plaintiff's medical condition provided directly by his primary care physician and an LMC-campus neurosurgeon, yet chose to alter and lie about the true

contents of the Plaintiff's disciplinary write-ups. The Plaintiff possesses copies of all corresponding records to prove these intentional, retaliatory misrepresentations.

54. Ms. Dempsey further advised Plaintiff that she did not want to penalize him or issue write-ups for historical "tardies" that occurred prior to her tenure—specifically those tied to protected FMLA leave or those explicitly authorized and excused by previous management.

55. Despite Ms. Dempsey's vocal reluctance to penalize Plaintiff for protected and excused absences, Human Resources Representative Bootsie Wynne directly intervened and coerced Ms. Dempsey, forcing her to compile and proceed with the retaliatory disciplinary write-ups against Plaintiff.

56. The fact that Plaintiff's immediate supervisor openly recognized the impropriety of the discipline, yet was systematically forced by upper management and Human Resources to execute it, conclusively demonstrates that Defendant's attendance metrics were a mere pretext manufactured to target, intimidate, and retaliate against Plaintiff.

57. In the August 4, 2024 complaint, Plaintiff requested a standard 30-day assurance from management that he would not face further discrimination or retaliation based on his race, sex, disability, or FMLA status. Management flatly refused to provide these basic legal assurances, confirming Plaintiff's reasonable fear of imminent termination.

58. Following these protected complaints, Defendant escalated its retaliation, worsening the hostile work environment.

59. Immediately after Plaintiff submitted the formal written complaint of discrimination to HR and management, department supervisors accessed the EKG time system and systematically altered Plaintiff's previous time records to project a false, negative attendance history.

60. Plaintiff promptly alerted HR Representative Bootsie Wynne via email, identifying this conduct as active retaliation and requesting that HR intervene immediately to stop management from altering time records. Neither Ms. Wynne nor anyone within Human Resources responded to Plaintiff's request, effectively ignoring the complaint and failing to stop the ongoing retaliatory misconduct.

61. The extreme stress caused by Defendant's unlawful conduct resulted in severe physical manifestations for Plaintiff, including severe chest pains, insomnia, and dizziness, requiring medical intervention from his Primary Care Physician.

62. On August 19, 2024, Plaintiff participated in a conference call with Defendant's Human Resources department. Plaintiff requested a transfer to a different management structure to escape the hostile environment; this request was summarily denied.

63. During a previous call, management informed Plaintiff that if he refused to sign the pretextual, retaliatory disciplinary write-ups, he would be barred from returning to work.

64. Because Defendant rendered Plaintiff's working conditions objectively intolerable and left him with no reasonable alternative, Plaintiff was compelled to resign on August 19, 2024, constituting a constructive discharge.

65. During the separation process, Plaintiff requested severance pay to ease the financial transition; however, Defendant refused to offer any monetary support or separation benefits.

66. Left with no income due to the forced resignation, Plaintiff suffered immediate and severe financial distress. As a direct consequence, Plaintiff lost valuable stock positions and was forced to prematurely cash out his 401(k) retirement account to cover essential living expenses, resulting in severe economic loss and long-term financial harm.

67. On or around August 2024, the continuous pressure of Defendant's discriminatory and retaliatory actions culminated in a medical crisis for Plaintiff. Plaintiff suffered extreme chest pain, mild shortness of breath, and severe dizziness, necessitating immediate admission to an Emergency Department. Following a comprehensive clinical evaluation, medical personnel advised Plaintiff that the acute physical symptoms were directly attributable to severe, stress-related trauma. This emergency medical intervention clearly illustrates the profound physical toll and severe emotional distress inflicted upon Plaintiff as a direct and proximate result of Defendant's unlawful employment practices.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

68. Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) alleging discrimination and retaliation. The EEOC subsequently

issued Plaintiff a Notice of Right to Sue. This Complaint is filed within ninety (90) days of Plaintiff's receipt of said Notice of Right to Sue.

## COUNT I
## FMLA INTERFERENCE

*(29 U.S.C. § 2615(a)(1))*

69. Plaintiff realleges and incorporates paragraphs 1 through 68 as if fully set forth herein.

70. Plaintiff was an eligible employee and Defendant was a covered employer under the statutory definitions of the FMLA. Plaintiff was entitled to take protected medical leave under the FMLA due to a qualifying serious health condition.

71. Defendant interfered with, restrained, and denied the exercise of Plaintiff's FMLA rights by counting protected absences against his attendance record, systematically altering timekeeping entries, threatening suspension and termination, and denying necessary medical accommodations.

72. As a direct and proximate result of Defendant's unlawful interference, Plaintiff has suffered and continues to suffer financial loss, emotional distress, severe physical distress, and the loss of employment benefits.

## COUNT II
## FMLA RETALIATION

*(29 U.S.C. § 2615(a)(2))*

73. Plaintiff realleges and incorporates paragraphs 1 through 68 as if fully set forth herein.

74. Plaintiff engaged in protected activity by requesting, taking, and inquiring about FMLA-protected leave, and by complaining internally to management and Human Resources of ongoing FMLA violations.

75. Defendant subjected Plaintiff to adverse employment actions, including retaliatory time-card alterations, pretextual write-ups, threats of unpaid suspension, a hostile work environment, and a forced constructive discharge. A causal connection exists between Plaintiff's protected activity and Defendant's adverse actions.

76. As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered significant economic and non-economic damages.

## COUNT III
### TITLE VII DISCRIMINATION AND RETALIATION

*(42 U.S.C. § 2000e, et seq.)*

77. Plaintiff realleges and incorporates paragraphs 1 through 68 as if fully set forth herein.
78. Plaintiff is a Black male and, at all times material and relevant to this action, was a member of a protected class under Title VII of the Civil Rights Act of 1964, as amended, based upon his race and sex.
79. Defendant discriminated against Plaintiff with respect to the terms, conditions, and privileges of his employment by treating him less favorably, applying disciplinary standards harsher, and denying scheduling flexibilities that were routinely granted to similarly situated employees outside his protected class.
80. Plaintiff engaged in protected activity under Title VII by filing formal complaints with Human Resources regarding disparate and discriminatory treatment. Defendant retaliated against Plaintiff for his opposition to unlawful discrimination by intensifying the hostile work environment, falsifying time records, issuing false write-ups, and constructively discharging him.
81. As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost wages, lost benefits, severe emotional distress, and humiliation.

## COUNT IV
### DISABILITY DISCRIMINATION AND RETALIATION (ADA)

*(42 U.S.C. § 12101, et seq.)*

82. Plaintiff realleges and incorporates paragraphs 1 through 68 as if fully set forth herein.
83. Plaintiff is a qualified individual with a disability within the meaning of the ADA, as he suffered from a severe cervical spine impairment that substantially limited one or more

11

major life activities. Defendant had actual or constructive knowledge of Plaintiff's medical condition and disability.

84. Defendant discriminated against Plaintiff under the ADA by failing to accommodate his medical needs, penalizing him for disability-related absences and medical flare-ups (including post-seizure tardiness), manipulating his time cards, subjecting him to a hostile work environment, and forcing his constructive discharge.

85. Defendant further retaliated against Plaintiff for requesting reasonable accommodations and opposing disability discrimination in the workplace.

86. As a direct and proximate result of Defendant's unlawful actions, Plaintiff has sustained significant economic, compensatory, and long-term financial damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment against Defendant and grant the following relief:

- **A.** Enter a declaratory judgment that Defendant's acts and omissions violated the FMLA, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act;
- **B.** Award Plaintiff full back pay, lost benefits, front pay, and lost retirement/stock contributions resulting from his unlawful constructive discharge;
- **C.** Award Plaintiff liquidated damages as provided under the FMLA;
- **D.** Award Plaintiff compensatory damages for emotional distress, humiliation, mental anguish, and physical symptoms caused by the severe stress of Defendant's conduct;
- **E.** Award Plaintiff punitive damages for Defendant's willful, malicious, and recklessly indifferent violations of federal law;
- **F.** Award Plaintiff the costs and disbursements of this civil action; and
- **G.** Award such other, further, or alternative relief as this Court deems just, proper, and equitable.

71

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues and counts so triable.

Respectfully submitted,

By: _____ Jeffrey A. Williams (Pro Se)

**Jeffrey A. Williams**
8 Misty Morning Dr.
Columbia, SC 29229
Telephone: (803) 605-7772
Email: jeffwilliams.coding@gmail.com
*Plaintiff Pro Se*

Dated: _____June 5_____ , 2026